IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

v.

BENY MESIKA and
ELIZABETH KUECHER,

      Defendants.

CRIMINAL ACTION NO.

1:16-cr-224-MHC-CMS

## <u>REPORT AND RECOMMENDATION</u>

On June 21, 2016, a grand jury returned a twelve-count indictment charging Beny Mesika and John Wesley Houser, IV with being part of a conspiracy to "manufacture, distribute and dispense products labeled and marketed as 'dietary supplements' designed to increase muscle mass and strength, which in fact contained anabolic steroids." [Doc. 1, ¶¶ 1-2]. In addition to conspiracy, the indictment also charged Mesika and Houser with two counts of distribution of controlled substances, two counts of introducing misbranded drugs into interstate commerce, and seven counts of money laundering. [<u>Id.</u> ¶¶ 6-16].

On April 19, 2017, Houser pleaded guilty to being part of a conspiracy to distribute anabolic steroids via a one-count information in Case No. 1:17-cr-134-MHC.

On December 19, 2017, a grand jury returned a twenty-five-count superseding indictment in this case. [Doc. 85 ("Superseding Indictment")]. Houser was removed as a defendant, and Elizabeth Kuecher was added as a defendant. [Id.]. The Superseding Indictment charges Mesika and Kuecher with being part of three separate conspiracies—one involving the manufacture, distribution, and possession of anabolic steroids (Count One), the second involving the unlawful importation of synthetic steroid compounds from China and Hong Kong (Count Eight), and the third involving the operation of facilities that should have been, but were not, registered with the United States Food and Drug Administration ("FDA") (Count Twelve). Both Mesika and Kuecher are also charged with three counts of smuggling (Counts Nine through Eleven) and four counts of failure to register a food facility (Counts Thirteen through Sixteen). Additionally, Mesika is charged with three counts of distribution of controlled substances (Counts Two through Four), three counts of introducing misbranded drugs into interstate commerce (Counts Five through Seven), and nine counts of money laundering (Counts Seventeen through Twenty-Five).

This matter is before the Court on two motions filed by Mesika: (1) a Motion and Amended Motion to Suppress Statements ("Statements Motion") [Docs. 47, 61]; and (2) a Motion to Suppress Evidence Relating to Search Warrants

2

("Warrants Motion") [Doc. 46].  After Kuecher was added as a defendant, she adopted the Warrants Motion.  [Doc. 110].

## STATEMENTS MOTION

## I.    BACKGROUND

In Mesika's original Statements Motion [Doc. 47], he argues that on October 4, 2013, he was illegally questioned by special agents from the Food and Drug Administration's Office of Criminal Investigations ("FDA-OCI").  He contends that the questioning occurred while he was in custody, and therefore, the agents should have given him his <u>Miranda</u> warnings before questioning him.  [<u>Id.</u> at 2]. Acknowledging that he was not in "formal custody" at the time of the interview, Mesika contends that because he was under criminal investigation at the time, he was being served with a criminal grand jury subpoena, and he was questioned by the lead agents in the investigation, "[Mesika] believed he could not simply walk out the door at any time."  [<u>Id.</u> at 5-6].  Mesika also appears to argue that if he had answered some of the agents' questions, he would have incriminated himself, and therefore, he was entitled to <u>Miranda</u> warnings.  [<u>Id.</u> at 7].  He complains further that the agents engaged in improper "psychological conditioning" techniques designed to elicit incriminating statements.  [<u>Id.</u> at 8].  In his motion, Mesika asserts that at some point he requested an attorney, but that the agents continued to

question him.  [Id. at 8-10].  Mesika also argues that his October 4, 2013 statement was not voluntary.  [Id. at 10-11].

Two months later, Mesika supplemented his Statements Motion, asserting that statements he gave during an interview on May 16, 2013 should also be suppressed.  [Doc. 61 at 1-2].  Again, Mesika argues that he was in custody and was not given Miranda warnings.  [Id.].  In support of his contention that he was in custody, Mesika states, "during the May 16, 2013 interview, the agents confronted [him] and expressly told him that his conduct violated [federal law] and that the products are classified as misbranded."  [Id. at 4].  He also argues that his May 16, 2013 statement was not voluntary.

On April 28, 2017, I held an evidentiary hearing on the Statements Motion.  [Doc. 67, Transcript ("Tr.") at 53-54].  At that hearing, the Government presented the testimony of Scott Tolman and Brian Kriplean, both special agents with the FDA-OCI.

A.     The May 16, 2013 Statement

Scott Tolman testified that on May 16, 2013, he conducted a non-custodial interview of Beny Mesika at Mesika's business office at 4301 Pleasantdale Road, in Atlanta, Georgia as part of an investigation concerning unlisted ingredients in a nutritional supplement that had been shipped from Mesika's address with his name

4

on it.  [Tr. at 52-53, 69].  According to Special Agent Tolman, Mesika and his company were targets of the investigation.  [Id. at 53].  Special Agent Tolman testified that he arranged the interview in advance by speaking with Mesika by phone.  [Id. at 54].  At the designated time and place, Special Agent Tolman arrived at Mesika's business in an unmarked car, along with Special Agent Gerald Dunham, also of the FDA.  [Id. at 55].  Both were wearing casual clothes.  [Id.].  The agents were armed, but their weapons were not visible.  [Id.].  Upon their arrival, Mesika met the agents, who showed Mesika their credentials.  [Id.].

Special Agent Tolman testified that he and Special Agent Dunham entered Mesika's business into an open room similar in size to my courtroom, and they sat down at a conference table.  [Tr. at 56].  The conversation began with a discussion about Mesika's love for fine art, and then it moved on to Mesika's business.  [Id. at 57].  According to Special Agent Tolman, Mesika appeared relaxed during the conversation, and was not nervous.  [Id. at 57-59].  At one point, Mesika did not fully answer a question about where he was obtaining his product, but the agents did not press the issue.  [Id. at 58-59].  The interview lasted about thirty minutes, and ended with Mesika making a joke about the agents' car (a Hyundai Sonata).  [Id. at 60].

### B.     The October 4, 2013 Statement

Special Agent Kriplean testified that he was part of a team that began investigating Mesika and Houser in August 2012.  [Tr. at 7-8].  According to Special Agent Kriplean, he conducted an interview with Mesika on October 4, 2013 at 4301 Pleasantdale Road, which was one of the locations where Mesika operated his dietary supplement businesses.[1]  [Id. at 8-9].  Special Agent Kriplean testified that the previous month, law enforcement had executed a search warrant in Texas on a  supplement distribution company, and that search revealed evidence that one of Mesika's businesses may have manufactured some of the products that

---

[1]   Mesika is part owner of at least two supplement-related businesses that share a common physical address of 4301 Pleasantdale Road in Atlanta, Georgia— Active Sports Supplements, LLC and Adrenaline Nutrition Supplements, LLC. [Tr. at 8; Doc. 84-5 ¶¶ 31-32].   Throughout the evidentiary hearing on the Statements Motion, the lawyers and witnesses also referred to those business entities as "Active Sports Nutrition" [Tr. at 8, 21, 23, 61, 64], "Nutritional Adrenaline Supplements" [id. at 63], "Applied Nutrition Supplements" [id. at 47], "Adrenaline Sports Nutrition" [id. at 9, 21, 39, 52, 63], and "ANS" [id. at 21, 47]. It is not clear from the record whether these are different entities or other names for Mesika's two businesses.  It appears to me, however, that the distinction between and among the businesses is not important for purposes of the Statements Motion. For that reason, I have not distinguished among the businesses in the Statements Motion portion of this Report and Recommendation.  If there is an important distinction that I have missed, the parties may raise that issue in any objections they may file.

were discovered.  [Id. at 9].  Following the search, the agents obtained a federal grand jury subpoena for one of Mesika's businesses.[2]  [Id.].

On October 4, 2013, Special Agent Kriplean and another agent went to Mesika's business on Pleasantdale Road in Atlanta with two purposes in mind—to serve the subpoena and to interview anyone they could at the location.  [Tr. at 9, 23].  The agents arrived at the location in an unmarked car wearing business casual clothing but with their badges and firearms exposed.  [Id. at 10].  Upon arrival, the agents identified themselves as agents with the FDA and showed their credentials to a woman named Elizabeth Kuecher.  [Id. at 11].  Special Agent Kriplean testified that he told Ms. Kuecher that "we had some documents to provide to the owners, and we would like to speak to one of them."  [Id.].  In response, Ms. Kuecher stated that neither was present but that she could call one of them on the phone, which she did.  [Id. at 11-12].  She then made a phone call that lasted about

---

[2] The subpoena was not introduced into evidence.  It is unclear from the record which of Mesika's businesses it was directed to; the testimony is contradictory on this point.  [Compare Tr. at 9 (Q: "And so what was the purpose of your visit to Adrenaline Sports Nutrition on October 4, 2013?" A: "We had a subpoena issued from the Western District of Tennessee for records for the company.") with Tr. at 23 ("It was for Active Sports Supplements.")].  Again, it does not appear that there is an issue with respect to which particular company the Government was seeking to serve with the subpoena; neither party disputed that the subpoena was addressed to one of Mesika's companies.  [Id. at 24].

thirty seconds and advised the agents that Mesika would be coming to meet them in about fifteen minutes. [Id. at 12].

The agents waited for Mesika in the foyer area, standing near a conference table. [Tr. at 13]. Approximately fifteen minutes later, Mesika arrived. [Id. at 14]. The agents identified themselves to him as agents, and they displayed their credentials. [Id.]. Then they all sat down at the conference table and spoke for approximately twenty minutes. [Id. at 16]. Special Agent Kriplean described the room as follows: "[I]t's a business about the size of this courtroom, and there aren't any partitioned walls per se that you can see. The conference table is visible from the front door, as is all the desks and the computers and such. . . one large room." [Id. at 32]. Special Agent Kriplean sat at the head of the table; Mesika was seated to his left, and the other agent was seated to his right. [Id. at 16]. According to Special Agent Kriplean, Mesika was not restrained in any way, and there was nothing that might have caused Mesika to believe that he was not free to leave. [Id.].

Special Agent Kriplean testified that he did not tell Mesika that he was under arrest or that he was required to answer any questions. [Tr. at 16-17]. He described the interview as a "casual conversation" that was not confrontational, and he described Mesika's demeanor as "calm." [Id. at 17]. When Special Agent

Kriplean asked Mesika who manufactured the products that his company was distributing, Mesika declined to answer and said that he would not like to answer any more questions without talking to his attorney.  [Id. at 17-18].  Special Agent Kriplean testified that after that point, they did not ask any more questions, and they served the grand jury subpoena on Mesika.  [Id. at 18].  He explained to Mesika in general terms what the subpoena was, what records it was seeking, and how Mesika could produce the records.  [Id.].  Special Agent Kriplean testified that after Mesika was served with the subpoena and while Kriplean was going over the subpoena, Mesika "made a comment to the effect that he had previously had an encounter with FDA agents regarding a purchase of products that had a banned substance in it that was not banned at the time that the product was purchased."  [Id.].  At that point, the agents left.  [Id. at 19].

### C.     Mesika's Statements Motion

As noted above, Mesika originally moved to suppress only the October 4, 2013 statement but later supplemented his motion to include the May 16, 2013 statement.  [Docs. 47, 61].  Following the evidentiary hearing and the preparation of the transcript, Mesika filed a post-hearing brief omitting some of the arguments

9

that he had previously made.[3]  [Doc. 80].  The Government filed a response.  [Doc. 84].  Mesika did not file a reply.  In his post-hearing brief, Mesika argues that he was entitled to Miranda warnings during both interviews for several reasons that are discussed more fully below.

## II.  DISCUSSION

Mesika's arguments fall into two categories.  First, he argues that he was effectively in custody during the interview, such that the agents' failure to advise him of his Miranda rights renders his statements inadmissible.  Second, he argues that his statements were not voluntary.  [Doc. 80 at 4-6].  As explained below, I find both these arguments to be meritless, and I recommend that the Statements Motion be DENIED.

### 1.  *Whether Mesika Was in Custody*

Once in custody, a suspect may not be interrogated unless he is advised of his Miranda rights, he demonstrates that he understands them, and he voluntarily waives them, either explicitly or implicitly.  See Yarborough v. Alvarado, 541 U.S. 652, 661-63 (2004).  Custody is established if, in light of the circumstances of an interrogation, a reasonable person would have felt that he was not at liberty to

---

[3] For example, Mesika originally complained that he was questioned after he asked for a lawyer [Doc. 47 at 8-10], but in his post-hearing brief, he appears to have abandoned that argument [Doc. 80].

terminate the interrogation and leave.  See id. at 663.  The test is objective: whether a reasonable person in the defendant's position would feel a restraint on his freedom equivalent to that normally associated with formal arrest.  See Berkemer v. McCarty, 468 U.S. 420, 441 (1984); United States v. Torkington, 874 F.2d 1441, 1445 (11th Cir. 1989).  The Eleventh Circuit considers several factors in applying this objective test, including whether the officers brandished weapons, touched the suspect, or used language or a tone that indicated that compliance with the officers could be compelled.  See United States v. Street, 472 F.3d 1298, 1309 (11th Cir. 2006).  No particular fact in the "custody" analysis is outcome determinative; rather, the court simply weighs the totality of the circumstances.  See United States v. Lall, 607 F.3d 1277, 1284 (11th Cir. 2010).  Defendant carries the burden of showing that he was in custody, and therefore, that Miranda warnings were necessary.  See United States v. de la Fuente, 548 F.2d 528, 533 (5th Cir. 1977); United States v. Peck, 17 F. Supp. 3d 1345, 1353-55 (N.D. Ga. 2014) (discussing the applicability of de la Fuente).

In support of his contention that he was effectively in custody, Mesika points to the following facts:

- at the time of the interviews, Mesika was under federal investigation, the outcome of which could affect Mesika's freedom;

- the agents used a "ruse" and various "tactics" to get Mesika to talk, specifically during the second interview when they did not tell him up front that they were there to serve a subpoena on him;

- the interviews were conducted in a hostile, freedom-inhibiting environment; and

- the questions posed were designed to elicit inculpatory statements.

[Doc. 80 at 4-6]. According to Mesika, these facts would make a reasonable, innocent person believe that he was not free to leave, meaning that Mesika should have been given Miranda warnings.

Analysis of the circumstances presented in this case leads to a conclusion that Mesika has not carried his burden of establishing that he was in custody, for Miranda purposes, during his interviews. The undisputed evidence is that he agreed to be interviewed, and he arrived at both the interviews without the assistance or involvement of law enforcement, knowing that federal agents wanted to speak with him. Although he was not told that he was free to leave, he also was not told that he could not leave. The tone of the interviews was calm, and there is no evidence that either interview became confrontational. There is no evidence that the agents touched Mesika, brandished their weapons, or prevented him from leaving. When, during the second interview, Mesika indicated that he wanted to speak with a lawyer, the questioning ceased. Mesika has presented no evidence of

any threats, coercion, or deception on the part of law enforcement.  To the extent Mesika implies that there was something improper about the fact that the agents conducted an interview with him that was designed to bolster their case against him, he has presented no law to support that argument.  Nor has Mesika shown that the agents were somehow required to serve the subpoena before attempting to interview him.  There is simply nothing in the record to show that anything improper occurred or that there was any attempt to intimidate or trick Mesika.  In sum, there is no evidence to support Mesika's argument that a reasonable person in his position would have felt that he was subject to a restraint on his freedom of movement akin to a formal arrest.  Because Mesika was not in custody when he made the statements to the agents, <u>Miranda</u> warnings were not required.  Accordingly, this basis for his Statements Motion is without merit.

2.    *Whether Mesika's Statements Were Voluntary*

"[A] confession, in order to be admissible, must be free and voluntary; that is, [it] must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight."  <u>Bram v. United States</u>, 168 U.S. 532, 542-43 (1897) (citations omitted).  The focus of the voluntariness inquiry is on whether the defendant was coerced by the government into making the statement.  <u>See</u> <u>Colorado v. Connelly</u>, 479 U.S. 157, 170 (1986) (citing <u>Moran v. Burbine</u>, 475

U.S. 412, 421 (1986) ("The relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception.")).  The issue of voluntariness is determined by examining the totality of the circumstances, and the burden is on the Government to establish, by a preponderance of the evidence, that a challenged confession was voluntary.  See Lall, 607 F.3d at 1285.

In his post-hearing brief, Mesika makes only a single passing reference to the voluntariness of his statement: "The fact that Mesika was not informed of his Miranda rights or told that he was free to stop the interview at any time also indicates his statement was not voluntarily made with knowledge of the situation facing him." [Doc. 80 at 4].  This argument fails both factually and legally.  There is no evidence of any threats, violence, or promises.  There is no evidence to indicate that Mesika was held in the conference room, that he was in an intimidating custodial condition, or that he was deprived of his liberty at any point during either interview.  Mesika was not handcuffed or restrained during the interviews, and the undisputed evidence is that everyone spoke in calm, non-confrontational tones.  There is simply nothing in the record to suggest that Mesika was coerced, threatened, or intimidated into speaking with the agents, or that the agents made any promises to induce him to talk.  Moreover, the fact that Mesika

requested an attorney during the second interview shows that he had the ability to refuse to answer questions and that he was aware of that right.  Based on the totality of the circumstances and the evidence presented at the hearing, I conclude that the Government has carried its burden of showing that both of Mesika's statements to the agents were voluntary.  Therefore, this second basis for the Statements Motion also is without merit.

For these reasons, I recommend that the Statements Motion be DENIED in its entirety.

<u>**WARRANTS MOTION**</u>

I.     **BACKGROUND**

A.     **The Business Location Warrants**

On January 24, 2014, federal law enforcement officers presented Gerrilyn Brill, a United States Magistrate Judge for the Northern District of Georgia, with an affidavit and application for a series of search warrants authorizing the search of four business properties associated with Mesika (the "Business Locations").[4] [Doc. 84-5 ("Kriplean Aff.") ¶ 2].

---

[4]   Three of the Business Locations are in Norcross, Georgia and one is in Atlanta, Georgia: 4301 Pleasantdale Road, Suite I, Atlanta, Georgia (Subject Location A); 6080 McDonough Drive, Suite D, Norcross, Georgia (Subject Location B); 1755 Wilwat Drive, Suite E, Norcross, Georgia (Subject Location C);

The affiant was Brian Kriplean, the Special Agent who had conducted the October 4, 2013 interview with Mesika.  In his affidavit, Special Agent Kriplean averred that there was probable cause to believe that Active Sports Supplements, LLC ("Active Sports"), one of the occupants of the four Business Locations, was "engaged in the wholesale distribution and manufacturing of purported dietary supplement products that are misbranded and adulterated foods and/or drugs, some of which contain anabolic steroids." [Kriplean Aff. ¶ 3].  Special Agent Kriplean explained in his affidavit that the FDA is the federal agency responsible for protecting the health and safety of the American public by enforcing the federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301-395 ("FDCA").  [Id. ¶ 9].  He also explained that pursuant to the Controlled Substances Act, 21 U.S.C. §§ 801 et seq. ("CSA"), certain substance classified as anabolic steroids are Schedule III controlled substances.  [Id. ¶¶ 26-27].

According to Special Agent Kriplean, in June 2012, the FDA-OCI began an investigation into the distribution of misbranded and adulterated dietary supplements suspected to contain anabolic steroids and other drugs not considered to be dietary ingredients.  [Kriplean Aff. ¶ 29].  The investigation identified a

---

and 6250-A McDonough Drive, Norcross, Georgia (Subject Location D). [Kriplean Aff. ¶ 2].

network of individuals and businesses involved in nationwide manufacturing and distribution of certain dietary supplements marketed by the dietary supplement industry as "pro-hormone supplements" intended to increase muscle mass and strength. [Id. ¶ 30]. Two of the businesses identified were Active Sports and Adrenaline Nutrition Supplements, LLC ("ANS") (collectively "the Subject Businesses"); the Subject Businesses were incorporated by Mesika and Houser. [Id. ¶¶ 31-33]. In the affidavit, Special Agent Kriplean stated that the Subject Businesses, Mesika, and Houser, were "believed to be using [the four Business Locations] to illegally manufacture, warehouse, distribute, and sell" dietary supplements that contained non-dietary ingredients and/or controlled substances. [Id. ¶ 33-34].

Special Agent Kriplean averred that during the investigation, law enforcement also identified two companies owned by a man named Joe De Melo—Rezultz Distribution, LLC ("Rezultz") and NutriPac Manufacturing, LLC ("NutriPac")—that were distributing some dietary supplements, including pro-hormone supplements, that ANS had manufactured. [Kriplean Aff. ¶¶ 42-46]. From July 2012 to May 2013, law enforcement made three undercover purchases from Rezultz and sent the products to the FDA's Forensic Chemistry Center for analysis. The testing revealed that "[m]any of the products were found to contain

17

non dietary ingredients including anabolic steroids" that were illegal for Rezultz to distribute and were illegal for ANS to manufacture.  [Id. ¶ 47].  In September 2013, several products were seized from Rezultz during the execution of a federal search warrant, including products bearing the same name as products that NutriPac had purchased from ANS.  [Id. ¶ 48].  Several of those products also tested positive for anabolic steroids.  [Id. ¶ 49].  During the course of the investigation, financial records revealed that NutriPac had issued checks to the Subject Businesses in amounts in excess of $200,000 during a five-month period between November 2012 and April 2013.  [Id. ¶ 54].

In his affidavit, Special Agent Kriplean referred to his October 2013 interview with Mesika during which Mesika allegedly advised that his company "did not manufacture dietary supplements but was in the process of acquiring a FDA registered and GMP certified facility to commence manufacturing." [Kriplean Aff. ¶ 57].  He then proceeded to provide additional facts related to the connection between the Subject Businesses and each of the four Business Locations that he was requesting be searched, facts showing the relationship between the Subject Businesses and De Melo's businesses, and evidence that the Subject Businesses were actively engaged in improperly manufacturing dietary supplements.  [Id. ¶¶ 58-88].  This evidence included: checks issued by Active

Sports for rent, utilities, and insurance payments at the four Business Locations; checks issued by Active Sports for large pieces of manufacturing equipment; a purchase order purportedly showing a link between a North Carolina man diagnosed with liver toxicity and a product purchased from ANS; items recovered from the dumpster behind one of the Business Locations that were consistent with the manufacture of dietary supplements; and the results of surveillance connecting the Subject Businesses, Mesika, and Houser to the four Business Locations and showing that they were engaged in the manufacture of dietary supplements. [Id. ¶¶ 61-88].

Judge Brill witnessed the applications and signed the warrants (the "Business Location Warrants"), authorizing law enforcement to search the four Business Locations for "evidence, fruits, and instrumentalities of violations of federal law, including 21 U.S.C. § 331 [relating to prohibited acts with respect to adulterated or misbranded food or drugs], 21 U.S.C. § 841(a)(1) [making it a crime to manufacture, distribute, dispense, and possess controlled substances], and 18 U.S.C. § 1341 and 1343 [prohibiting mail and wire fraud], related to purported dietary supplements." [Attachment B to Docs. 84-1 (Subject Location A), 84-2 (Subject Location B), 84-3 (Subject Location C), 84-4 (Subject Location D)]. Those items included, among other things: misbranded and/or adulterated foods or

drugs; raw materials used to manufacture misbranded and/or adulterated food or drugs; labels and advertisements pertaining to misbranded and/or adulterated food or drugs; paraphernalia for packaging, weighing, or distributing misbranded and/or adulterated food or drugs; and equipment used to manufacture misbranded and/or adulterated food or drugs.  [Id.].  The Business Location Warrants also authorized the seizure of other, more general, information related to the operation of the Subject Businesses, such as computers and business records "pertaining to the illegal purchase, possession, and/or unauthorized distribution of misbranded and/or adulterated foods and/or drugs."  [Id.].

**B.    The Residence Warrant**

Two years later, on June 21, 2016, Mesika and Houser were indicted, as described above.  [Doc. 1].  Thereafter, Mesika was arrested, and he had his initial appearance in this Court on July 1, 2016 before United States Magistrate Judge Janet King.  [Doc. 11].  That same day, Special Agent Kriplean returned to federal court and presented Judge King with an affidavit and application for a warrant authorizing the search of Mesika's residence located at 8241 Nesbit Ferry Road, in Sandy Springs, Georgia.  [Doc. 63-1 ("Second Kriplean Aff.") ¶ 2].

In his affidavit, Special Agent Kriplean averred that he was part of the group sent to execute the arrest warrant on June 30, 2016 at Mesika's residence.  [Second

Kriplean Aff. ¶ 11].   When they arrived, the agents received consent from an occupant of the home to search for Mesika.   [Id.].   According to the affidavit in support of the application for the warrant, while searching for Mesika, Special Agent Kriplean observed several items "in plain view inside a closet within the attached garage." [Id.].   Those items included "several international parcels which purported to contain quantities of chemical compounds . . . labels for dietary supplement products; and a box which appeared to contain the dietary supplement product called 'Steel Woody.'" [Id.].   According to Special Agent Kriplean, these items were consistent with other items he had encountered during his investigation. [Id. ¶ 12].   He stated that he was aware from his investigation that: (1) Mesika and Houser had purchased chemical compounds from international suppliers to manufacture misbranded drugs containing anabolic steroids; and (2) "Steel Woody" is a product that had been found to contain an undeclared prescription drug.   [Id.].   Special Agent Kriplean stated that based on these facts, he believed that there was probable cause to believe that execution of a warrant at Mesika's home would reveal evidence of violations of federal law, including the introduction into interstate commerce of misbranded and adulterated foods or drugs and distribution of (and conspiracy to distribute) anabolic steroids, a controlled substance.   [Id. ¶ 3].

21

Judge King witnessed the application and signed the warrant, which is hereinafter referred to as the "Residence Warrant." [Doc. 63-2]. The Residence Warrant authorized law enforcement to search Mesika's residence for "evidence, fruits, and instrumentalities of violations of federal law, including 21 U.S.C. § 331(a) [relating to prohibited acts with respect to adulterated or misbranded food or drugs], 21 U.S.C. § 841(a)(1) and (b)(1)(E) [making it a crime to manufacture, distribute, dispense, and possess controlled substances], and 21 U.S.C. § 846 [conspiracy], related to purported dietary supplements." [Attachment B to Doc. 63-2]. Those items included, among other things: any potentially misbranded and/or adulterated foods or drugs; raw materials used to manufacture misbranded and/or adulterated food or drugs; labels and advertisements pertaining to misbranded and/or adulterated food or drugs; equipment used to manufacture misbranded and/or adulterated food or drugs; and paraphernalia for packaging, weighing, or distributing misbranded and/or adulterated food or drugs. [Id.]. The Residence Warrant also authorized the seizure of all business records "pertaining to the illegal purchase, possession, and/or unauthorized distribution of misbranded and/or adulterated foods and/or drugs." [Id.].

### C.    The Computer Warrant

Twelve days after obtaining the Residence Warrant, on July 13, 2016, Special Agent Wesley Cooper of the Internal Revenue Service Criminal Investigations ("IRS-CI") presented United States Magistrate Judge John K. Larkins, III with an application and affidavit seeking a warrant to search and copy the data and contents of three computers that had been seized from Mesika's residence during the execution of the Residence Warrant.  [Doc. 84-7 ("Cooper Aff.")].  In the affidavit in support of the request, Special Agent Cooper stated that there was probable cause to believe that the requested search of the computers would reveal evidence of violations of federal law, including the introduction into interstate commerce of misbranded and adulterated foods or drugs as well as distribution of (and conspiracy to distribute) anabolic steroids, a controlled substance.  [Id. ¶ 3].  Attached to Special Agent Cooper's affidavit as Exhibit 1 was the affidavit that had been submitted to Judge King in connection with the Residence Warrant.  According to Special Agent Cooper, he believed that the computers could have been used by Mesika and Houser (in the course of the business to manufacture and distribute misbranded drugs and drugs containing anabolic steroids) to create, maintain, and transmit business records such as email correspondence, purchase orders, invoices, work orders, and wire transfers.  [Id.

¶ 12].   He further averred that businesses and individuals engaged in illegal enterprises and the laundering of illicit proceeds often produce and maintain records of such criminal activity on their computers.  [Id. ¶ 13].

Judge Larkins witnessed the application and signed the warrant, hereinafter referred to as the "Computer Warrant."  [Doc. 84-6].  The Computer Warrant authorized the search of three specified computers [see Attachment A to Doc. 84-6] for "evidence, fruits, and instrumentalities of violations of federal law, including but not limited to 21 U.S.C. § 331(a) [relating to prohibited acts with respect to adulterated or misbranded food or drugs], 21 U.S.C. § 841(a)(1) and (b)(1)(E) [making it a crime to manufacture, distribute, dispense, and possession controlled substances], and 21 U.S.C. § 846 [conspiracy], related to purported dietary supplements" [Attachment B to Doc. 84-6].  The Computer Warrant stated that those items included "All business records and related correspondence, in whatever form, including handwritten and computer-generated, pertaining to the illegal purchase, possession, and/or unauthorized distribution of misbranded and/or adulterated foods and/or drugs. . . ."  [Id.].  The Computer Warrant then provided additional examples of what types of information could be seized.  [Id.].

## II.    DISCUSSION

### A.    The Business Location Warrants

Defendants argue that the Business Location Warrants were not supported by probable cause [Doc. 46 at 2, 9-13] and were unconstitutionally overbroad and not particularized [id. at 3, 13-19].[5]  I address these arguments in turn.

#### 1.    Probable Cause

Defendants contend that the Business Location Warrants were not supported by probable cause because (1) there is no direct link to show that the products seized from Rezultz originated from ANS; (2) although the affidavit states that the products seized from Rezultz tested positive for certain drugs, the affidavit "fails to state whether any amount/quantity of the drugs could be identified, or whether the product just tested positive for the presence of certain drug components"; and (3) there was insufficient information in the affidavit to establish probable cause with respect to each of the four Business Locations.  [Doc. 46 at 2, 9-13].

"[T]he task of a reviewing court is not to conduct a de novo determination of probable cause, but only to determine whether there is substantial evidence in the

---

[5]    Defendants also contend that the Kriplean Affidavit contained stale information, but they make no specific argument with respect to staleness.  [Doc. 46 at 3, 13].  In the absence of any argument directing the Court to any particular evidence or legal authority, I find this argument lacking in merit.

record supporting the magistrate judge's decision to issue the warrant." <u>United States v. Bushay</u>, 859 F. Supp. 2d 1335, 1379 (N.D. Ga. 2012) (citing <u>Massachusetts v. Upton</u>, 466 U.S. 727, 728 (1984)).  Probable cause to support a search warrant exists when the totality of the circumstances allows a conclusion that there is a fair probability of finding contraband or evidence at a particular location.  <u>See</u> <u>United States v. Brundidge</u>, 170 F.3d 1350, 1352 (11th Cir. 1999).  The search warrant affidavit must "state facts sufficient to justify a conclusion that evidence or contraband will probably be found at the premises to be searched." <u>United States v. Martin</u>, 297 F.3d 1308, 1314 (11th Cir. 2002) (citation omitted).  "[T]he affidavit should establish a connection between the defendant and the residence to be searched and a link between the residence and any criminal activity." <u>Id.</u> (citation omitted).

Issuing judges are to employ a practical, commonsense approach to the probable cause analysis and should avoid hypertechnical review of the legitimacy of search warrants:

> In attempting to ensure that search warrant affidavits comply with the Fourth Amendment's prohibition against unreasonable searches and seizures resultant from warrants issued without probable cause, the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit, there is a fair probability that contraband or evidence of a crime will be found in a particular place.  Probable cause deals with probabilities. These are not technical; they are the factual and

> practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. Courts reviewing the legitimacy of search warrants should not interpret supporting affidavits in a hypertechnical manner; rather, a realistic and commonsense approach should be employed so as to encourage recourse to the warrant process and to promote the high level of deference traditionally given to magistrates in their probable cause determinations.

United States v. Miller, 24 F.3d 1357, 1361 (11th Cir. 1994) (internal citations and quotations omitted). Reviewing courts accord "great deference" to judicial determinations of probable cause to issue a search warrant. See United States v. Leon, 468 U.S. 897, 926 (1984); United States v. Joseph, 709 F.3d 1082, 1093 (11th Cir. 2013). Applying these standards, it is evident that Judge Brill followed the law, used a commonsense, practical approach, and correctly found that there was probable cause to believe that the requested searches would yield evidence of violations of law.

The Kriplean Affidavit demonstrated that on more than one occasion, law enforcement agents had purchased dietary supplement products that appeared to have been manufactured by ANS and that tested positive for both controlled and non-controlled anabolic steroids. [Doc. 84-5, Kriplean Aff. ¶¶ 42-53]. The affidavit also included facts related to a report of liver toxicity in a patient who had taken a dietary supplement that appeared to have been manufactured by ANS and that tested positive for non-dietary ingredients including dimethazine, testosterone,

and methasterone.  [Id. ¶¶ 49, 63-64].  And the affidavit contained sufficient facts

tying the suspected unlawful activity to all four locations, including facts derived

from surveillance, "trash pulls," government documents, UPS documents, bank

records, and witness interviews.  [Id. ¶¶ 46, 52-53, 55-56, 59, 61, 67-72, 74-88].

Taken together, the evidence presented in the Kriplean Affidavit established

a "fair probability that contraband or evidence of a crime [would be] found" at all

four Business Locations.  See United States v. Bradley, 644 F.3d 1213, 1263 (11th

Cir. 2011).  While it was not a certainty that such evidence would be discovered, it

was certainly probable that it would, and that is all that the law requires.  See

Miller, 24 F.3d at 1361.

## 2.   *Overbroad and Not Particularized*

Defendants also argue that the Business Location Warrants were

unconstitutionally overbroad and not particularized because: the warrants allowed

for the seizure of "all records" and a "whole-sale search and seizure of all the data

contained on computers," and they contained no pre-approved search protocol to

prevent the seizure and retention of documents not covered by the warrant and to

protect that information.  [Doc. 46 at 3, 13-19].

The Fourth Amendment provides that "no Warrants shall issue, but upon

probable cause, supported by Oath or affirmation, and particularly describing the

28

place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV.[6]  The particularity requirement protects against "the use of general warrants as instruments of oppression." Stanford v. Texas, 379 U.S. 476, 482 (1965).  "The requirement that warrants particularly describe the place to be searched and the things to be seized makes general searches under them impossible." United States v. Travers, 233 F.3d 1327, 1329 (11th Cir. 2000) (citing Stanford, 379 U.S. at 485).  A search based on a warrant that fails to sufficiently particularize the place to be searched or the things to be seized is unconstitutional.  To deter such warrants and searches, any evidence so seized must be excluded from the trial of the defendant.  See Stone v. Powell, 428 U.S. 465, 492 (1976) ("Evidence obtained by police officers in violation of the Fourth Amendment is excluded at trial in the hope that the frequency of future violations will decrease.").  The Eleventh Circuit instructs that the particularity requirement "be applied with a practical margin of flexibility, depending on the type of property to be seized, and that a description of property will be acceptable if it is as

---

[6]  Thus, the Fourth Amendment requires that a warrant particularly describe both (1) the place to be searched and (2) the persons or things to be seized.  See United States v. Travers, 233 F.3d 1327, 1329 (11th Cir. 2000).  Here, Defendants argue that the Business Location Warrants were not sufficiently particular with respect to the ***things to be seized***; they do not make that argument with respect to the ***place to be searched***.

specific as the circumstances and nature of activity under investigation permit."
United States v. Wuagneux, 683 F.2d 1343, 1349 (11th Cir. 1982) (citations
omitted).

I note initially that in making their overbreadth argument, Defendants ignore
the fact that the scope of the things to be seized in the Business Location Warrants
is explicitly limited in multiple ways.  First, the opening phrase of Attachment B
operates as a limitation, authorizing the seizure of "[e]vidence, fruits, and
instrumentalities" of violations of the FDCA and the CSA as well as mail and wire
fraud.  [Docs. 84-1 through 84-4 at 4].  Second, the "business records" category
about which Defendants primarily complain contains an additional limiting
provision:

> 9.    All business records and related correspondence, in whatever
> form, including handwritten and computer-generated,
> *pertaining to the illegal purchase, possession, and/or*
> *unauthorized distribution of misbranded and/or adulterated*
> *foods and/or drugs*. . . .

Id. (emphasis added).  In making their arguments, Defendants simply do not
acknowledge these limitations.

By explicitly limiting the scope of what could be seized to evidence of the
crimes under investigation, the Business Location Warrants were sufficiently
particular to enable the searchers to reasonably ascertain and identify the

documents and information authorized to be seized.  See United States v. Wilson,

No. 4:12-cr-23-RLV-WEJ, 2012 WL 7992597, at *15 (N.D. Ga. Nov. 28, 2012)

(concluding that a search warrant was written with sufficient particularity because

the items listed on the warrants were qualified by phrases that emphasized that the

items sought were those related to the crime under investigation).  Because the

things to be seized were limited to only those things connected with the crimes

under investigation, there is a sufficient "nexus" that satisfies the practical realities

"that enable the searcher to ascertain and identify things authorized to be seized."

United States v. Smith, 918 F.2d 1501, 1507-08 (11th Cir. 1990) (approving

similar language for documents pertaining to narcotics trafficking).

Defendants complain that seventeen computers were seized, but "[s]o long

as the computer search is limited to a search for evidence explicitly authorized in

the warrant, it is reasonable for the executing officers to open the various types of

files located in the computer's hard drive in order to determine whether they

contain such evidence."  United States v. Richards, 659 F.3d 527, 540 (6th Cir.

2011) (citations and internal quotations omitted); see also United States v. Triplett,

684 F.3d 500, 505-06 (5th Cir. 2012) ("Although officers should limit exposure to

innocent files, for a computer search, in the end, there may be no practical

substitute for actually looking in many (perhaps all) folders and sometimes at the

documents contained within those folders") (citation and internal quotations omitted).  Here, having established a nexus between the crimes alleged and the computers, a thorough search of these items was the only practical way to determine whether they contained evidence of the crimes under investigation or any other information responsive to the specific categories of information set forth in the Business Location Warrants.

Defendants' argument that evidence should be suppressed because there was no pre-approved protocol for the computer searches also is without merit.  In United States v. Bradley, the Eleventh Circuit explicitly rejected this argument, stating, "we reject outright the [defendants'] claim that the searches were unconstitutional because the agents failed to obtain pre-approval from the district court of a search protocol before conducting the searches."  644 F.3d 1213, 1258 n.95 (11th Cir. 2011); see also United States v. Khanani, 502 F.3d 1281, 1290-91 (11th Cir. 2007) (rejecting the argument that the lack of a written search protocol required the district court to suppress all evidence agents seized as a result of the search of the defendants' computers); United States v. Intakanok, No. CR 114-060, 2014 WL 4825368, at *8 (S.D. Ga. Sept. 25, 2014) ("It is well-established in the Eleventh Circuit that warrants of this nature need not specify search protocols or methodologies in order to pass constitutional muster.").  Here, Defendants have

failed to cite any binding case law that would lead me to conclude that the procedures used in this case infringed on Defendants' Fourth Amendment rights.

Other courts presented with similar arguments have recognized the practical difficulties inherent in searching computers and have permitted law enforcement to seize computers under similar circumstances.  See United States v. Burgess, 576 F.3d 1078, 1094 (10th Cir. 2009) ("it is folly for a [computer] search warrant to attempt to structure the mechanics of the search, and a warrant imposing such limits would unduly restrict legitimate search objectives"); see also Richards, 659 F.3d at 538 nn.8-9 (collecting cases).

Moreover, the Kriplean Affidavit provided detailed information concerning the anticipated search and seizure of computers at the Business Locations.  [Doc. 84-5, Kriplean Aff.  ¶¶ 89-93].  Special Agent Kriplean stated facts to show that there was probable cause to believe that records could be stored on computer hard drives or other electronic storage media.  [Id. ¶ 90].  He also set forth the need to locate, and the process for reviewing, forensic computer evidence establishing how the computers were used, the purpose for their use, who used them, and when.  [Id. ¶ 91].  Special Agent Kriplean detailed the constraints of thoroughly searching computers on-site, thus requiring the seizure and/or imaging of entire computers and/or storage media for later, off-site review.  [Id. ¶ 92].  And he stated that the

search techniques used to locate the evidence described in the Business Location Warrants could include computer-assisted scans of the entire medium and might expose many parts of the computer hard drive to human inspection. [Id. ¶¶ 89-93]. This was sufficient for Judge Brill to authorize the seizure of the computers. Defendants have provided no case law holding that the information in the Kriplean Affidavit was insufficient or that the Business Location Warrants are somehow improper on the issue of computers, and therefore I conclude that Judge Brill's decision to sign the Business Location Warrants was proper. See generally Wilson, 2012 WL 7992597, at *15 (denying motion to suppress evidence seized from computers).

### B.    The Residence Warrant

Defendants make several arguments as to why the fruits of the Residence Warrant should be suppressed. First, they contend that the Residence Warrant was based on information illegally obtained via an illegal warrantless search that occurred when the agents were trying to arrest Mesika. [Doc. 46 at 19-20]. Second, they contend that the Residence Warrant was not supported by probable cause. [Id. at 4, 20]. Third, they argue that the Second Kriplean Affidavit failed to describe a nexus between the places to be searched and the items sought. [Id. at 4, 21]. Fourth, they contend that the Residence Warrant was unconstitutionally

34

overbroad and not particularized. [Id. at 4, 22]. Finally, they argue that law enforcement seized computers that were outside the scope of the Residence Warrant.[7] [Id. at 5, 21].

### 1. Fruit of the Poisonous Tree – the Look in the Closet

Defendants' lead argument challenging the Residence Warrant is that it was based on information illegally obtained because the agent "searched a closet" which amounts to an illegal warrantless search. According to Defendants, "[o]nce an agent opens a closet and does not see a human being, he has no right to remain and rummage through the contents of the closet." [Doc. 46 at 19-20]. I have previously addressed this argument when I denied Mesika's request for a Franks hearing, concluding:

> It is evident that Mesika has failed to make a sufficient preliminary showing to warrant a Franks hearing. Mesika does not contest that on June 30, 2016, law enforcement agents went to his residence to execute an arrest warrant; that those agents obtained consent to search the home for Mesika; that the items identified in the affidavit were actually located in the closet inside the garage; or that the agents looked in the closet as part of their lawful efforts to execute the arrest

---

[7]    Defendants also argue that the Second Kriplean Affidavit and the subsequent Cooper Affidavit contained stale information because Mesika had already been indicted at the time those affidavits were signed. [Doc. 46 at 4, 6, 21, 23]. Defendants provide no legal authority for the proposition that after a defendant is indicted, law enforcement cannot continue to investigate suspected criminal activity or obtain search warrants in furtherance of such investigations. In the absence of any such legal authority, I find this argument meritless.

> warrant.   Rather, Mesika contends only that the closet door in question was closed.  I note that Special Agent Kriplean does not state whether the door was closed or open, only that in an attempt to execute the arrest warrant, he "observed several items in plain view inside a closet within the attached garage."  (Doc. 63-1 at 6-7). Mesika provides no legal authority for the proposition that agents conducting a search for a person may not open a closet door and look inside or that the plain view doctrine does not apply to areas properly searched in connection with a consent search for a person in order to execute an arrest warrant.  I also note that Mesika makes no offer of proof, instead relying solely on argument of counsel.
>
> Mesika has failed to make a "substantial preliminary showing" that Special Agent Kriplean made a false statement or omission, either intentionally or with reckless disregard for the truth.  Franks, 438 U.S. at 171-72, 98 S. Ct. at 2684-85; United States v. Cross, 928 F.2d 1030, 1040 (11th Cir. 1991).  Nor has he shown that even if his version of the facts is true–i.e., that the closet door was closed–that the probable cause determination would be affected.  Id.

[Doc. 65 at 5-6].  For these same reasons, I find Defendants' first argument without merit.

### 2.    *Probable Cause*

Defendants next argue that the Residence Warrant was not supported by probable cause because Special Agent Kriplean did not state that possession of the prescription drug in Steel Woody is per se illegal.  [Doc. 46 at 4, 20].  As with Defendants' arguments regarding probable cause in the Business Location Warrants, Defendants again propose a hypertechnical review of the warrants, which is contrary to the Eleventh Circuit case law.

36

In his affidavit in support of the Residence Warrant, Special Agent Kriplean stated that during a consent search of Mesika's residence, he observed several items in plain view in an attached garage, including: (1) international parcels addressed to Mesika and/or his business partner, which appeared to contain chemical compounds; (2) labels for dietary supplements; and (3) a box containing the purported dietary supplement "Steel Woody." [Doc. 63-1, Second Kriplean Aff. ¶ 11]. He described these items as consistent with other items obtained during the investigation of Mesika, and noted that agents had previously acquired samples of "Steel Woody" during their investigation, which had been analyzed and found to contain the undeclared active pharmaceutical ingredient sildenafil. [Id. ¶ 12]. Special Agent Kriplean also stated that based on his experience and training, it is common for businesses and individuals engaged in the illegal manufacturing and distribution of adulterated and/or misbranded foods and/or drugs (i.e., the same criminal activity for which Mesika had just been indicted) to hide and maintain contraband and records of such crimes in their homes. [Id. ¶ 13]. Taken together, these facts easily satisfy the legal requirements for probable cause.

### 3.    Lack of a Nexus

Defendants next argue that the Second Kriplean Affidavit failed to describe a nexus between the places to be searched and the items sought because at the time

the warrant was issued, Mesika had not been charged with—and was not suspected of—manufacturing or distributing "Steel Woody." [Doc. 46 at 4, 21]. This argument simply ignores Special Agent Kriplean's statement that his investigation had revealed that certain samples of "Steel Woody" contained an undeclared active pharmaceutical ingredient and that Mesika's possession of "Steel Woody" is consistent with the type of unlawful conduct under investigation. [Second Kriplean Aff. ¶¶ 12, 13].

### 4. *Overbroad and Not Particularized*

Defendants next argue that the Residence Warrant was unconstitutionally overbroad and not particularized because it was not limited to the alleged contraband, but rather authorized law enforcement to seize "all business records and related correspondence, in whatever form, including handwritten and computer generated." [Doc. 46 at 4, 22]. Defendants have provided no case law to support their position that law enforcement could not search for documents and other evidence, but somehow should have been limited to "contraband," and I am aware of no such law.

Moreover, the Residence Warrant was not open ended. Rather, it limited the items to be seized to "[e]vidence, fruits, and instrumentalities of violations of federal law, including but not limited to Title 21 U.S.C. § 331(a), 21 U.S.C.

38

§ 841(a)(1) and (b)(1)(E), and 21 U.S.C. § 846, related to purported dietary supplements." [Doc. 63-2 at 4]. By explicitly limiting the scope of what could be seized to evidence of the crimes under investigation, the Residence Warrant was sufficiently particular to enable the searchers to reasonably ascertain and identify the documents and information authorized to be seized. See Wilson, 2012 WL 7992597, at *15; Smith, 918 F.2d 1501, 1507-08.

> 5. *Seizure of Evidence Outside the Scope of the Residence Warrant*

Finally, Defendants argue that law enforcement seized computers that were outside the scope of the Residence Warrant. According to Defendants, the Residence Warrant authorized the seizure only of records generated by a computer, not the computers themselves. [Doc. 46 at 5, 21]. In making this argument, Defendants again ignore both the wording of the warrant and the law governing search warrants.

The Residence Warrant identified the following category of things that could amount to evidence of violations of the specified federal laws: "[a]ll business records and related correspondence, in whatever form, including handwritten and computer-generated, pertaining to the illegal purchase, possession, and/or unauthorized distribution of misbranded and/or adulterated foods and/or drugs." [Doc. 63-2 at 4]. The Residence Warrant specifically defined the term

39

"documents" that could be seized as including, among other things, "computer Internet records" and "electronic correspondence." [Id.]. Therefore, the agents' seizure of repositories for such items, including computers, from Mesika's residence during execution of the Residence Warrant was reasonable. See United States v. Patel, 429 F. App'x. 885, 888 (11th Cir. 2011) (per curiam) ("[t]he crucial inquiry is always whether the search and seizures were reasonable under all the circumstances") (citation and internal quotations omitted).

### C.   The Computer Warrant

With respect to the Computer Warrant, Defendants argue that: (1) the Computer Warrant was not supported by probable cause; (2) the Cooper Affidavit failed to describe a nexus between the computers and the items sought; (3) the Computer Warrant was unconstitutionally overbroad and not particularized; and (4) the Computer Warrant should have contained, but did not contain, a time-frame limitation.[8]  [Doc. 46 at 5, 6, 23-25]. These arguments, like their predecessors, are unavailing.

---

[8]   Defendants also argue that the evidence used to obtain the Computer Warrant was the fruit of the poisonous tree because the Residence Warrant—through which law enforcement seized the computers—was obtained through evidence obtained illegally, i.e., the officers looking in the closet without a warrant; and the computers were outside the scope of the Residence Warrant. [Doc. 46 at 22-23].   For the reasons stated previously in this Report and

Twelve days after lawfully seizing the three computers from Mesika's residence, agents sought a separate warrant before searching those computers for evidence of criminal activities.  In his affidavit, Special Agent Cooper stated that on June 21, 2016, Mesika was indicted for conspiring to distribute controlled substances, distributing controlled substances, introducing misbranded drugs into interstate commerce, and money laundering.  [Doc. 84-7, Cooper Aff. ¶ 10].  He stated that based on the investigation to date, he was familiar with the records produced by Mesika in the course of manufacturing and distributing misbranded drugs and anabolic steroids, which included email correspondence, purchase orders, and invoices.  [Id. ¶ 12].  Special Agent Cooper averred that based on his training and experience, he was aware that computers are typically used to create, maintain, and transmit those types of records and that people involved in illegal enterprises and the laundering of illicit proceeds commonly produce and maintain records of such criminal activity on their computers.  [Id. ¶ 13].

Like the earlier affidavit submitted to Judge Brill in support of the Business Location Warrants, the Cooper Affidavit included an entire section detailing the probable cause to, and the intended way in which agents would, search for,

---

Recommendation, I conclude that there was nothing improper about the officers looking in the closet during the consent search of Mesika's house, and the computers were not outside the scope of the Residence Warrant.

identify, and ultimately seize electronic evidence.   [Cooper Aff. ¶¶ 15-19].
Defendants' characterization of the Cooper Affidavit as overbroad and non-
particularized simply is not supported by the facts or the law.  It is evident that the
initial seizure of the computers from Mesika's residence was within the scope of
the Residential Search Warrant, and the separate Computer Warrant properly
authorized agents to search the computers for evidence of specific, enumerated
crimes.

Defendants also argue that the Computer Warrant was unconstitutionally
overbroad and not particularized because it authorized the seizure of all
information and records "with no probable cause limitation on which electronic
data, computers or files therein could be seized"; no procedures were set to govern
the search of the computers; and no reason was given for why an inspection could
not be performed on site.   [Doc. 46 at 6, 24-25].   I find these arguments
unpersuasive for the same reasons stated earlier in this Report and
Recommendation.  The Computer Warrant did, in fact, contain limitations on the
information that could be seized.  [Doc. 84-6 at 4].  The U.S. Constitution does not
require that warrants of this nature specify search protocols.  See supra at 31-32.
Finally, the Cooper Affidavit explained why an on-site inspection would not be
sufficient.  [Cooper Aff. ¶¶ 18-19].

**D.** *Leon* **Good Faith Exception to the Exclusionary Rule**

Moreover, the Government correctly argues that even if the various warrants at issue in the Warrants Motion were not supported by probable cause (which they were), the good faith exception to the exclusionary rule under United States v. Leon, 468 U.S. 897, 926 (1984), saves the fruit of the warrants from suppression. [Doc. 84 at 32].   Defendants did not file a reply or otherwise respond to this argument.

In Leon, the Supreme Court held that even if a search warrant is ultimately found to be unsupported by probable cause, the Fourth Amendment will not bar admission of evidence obtained by law enforcement officers if the officers were acting in reasonable reliance upon the search warrant.   See United States v. Martin, 297 F.3d 1308, 1313 (11th Cir. 2002) (citing Leon, 468 U.S. at 922).   Because the purpose of the exclusionary rule is to deter unlawful police misconduct, the Leon good faith exception requires suppression "only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause."   Leon, 468 U.S. at 926.   The Eleventh Circuit interpreted Leon as follows:

> The Leon good faith exception applies in all but four limited sets of circumstances [citation omitted].   The four sets of circumstances are as follows: (1) where the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or

would have known was false except for his reckless disregard of the truth; (2) where the issuing magistrate wholly abandoned his judicial role in the manner condemned in Lo-Ji Sales, Inc. v. New York, 442 U.S. 319, 99 S. Ct. 2319, 60 L.Ed.2d 920 (1979); (3) where the affidavit supporting the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) where, depending upon the circumstances of the particular case, a warrant is so facially deficient–i.e., in failing to particularize the place to be searched or the things to be seized–that the executing officers cannot reasonably presume it to be valid.

Martin, 297 F.3d at 1313 (internal quotation marks omitted).  Here, Defendants did not file a reply or otherwise argue any of the exceptions apply.  Having reviewed the entire record, all the arguments presented, and the relevant case law, I can see no basis for finding that any of the four circumstances articulated about are applicable here.  Thus, if the warrants lacked the requisite probable cause, Leon would apply and prevent application of the exclusionary rule.

For all the reasons discussed herein, I recommend that the Warrants Motion be DENIED in its entirety.

## CONCLUSION

I **RECOMMEND** that Mesika's Statements Motion, as amended, [Docs. 47, 61], be **DENIED,** and that the Warrants Motion [Docs. 46, 110] also be **DENIED** as to both Kuecher [9] and Mesika.

I have now addressed all referred pretrial matters and have not been advised of any impediments to the scheduling of a trial. Accordingly, the case is **CERTIFIED READY FOR TRIAL**.

**SO REPORTED AND RECOMMENDED**, this 30th day of March, 2018.

CATHERINE M. SALINAS
United States Magistrate Judge

---

[9]   Additionally, Kuecher has failed to show that she had a reasonable expectation of privacy in any the locations identified in the Business Location Warrants, in Mesika's residence, or in the computers.  I allowed Kuecher to adopt Mesika's Warrants Motion. [Doc. 109].  Thereafter, I gave her the opportunity to establish standing. [Doc. 120 ("If Kuecher contends that she has standing to challenge one or more of the warrants at issue in the Warrants Motion, Kuecher must make a showing, in writing, that she has standing to do so, no later than the close of business on March 26, 2018."].  Kuecher failed to accept my invitation to make such a showing.  She has failed to demonstrate that she had a legitimate expectation of privacy in any of places searched.  Accordingly, the Warrants Motion should be denied as to her for this additional reason.

45